IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


CONSTANCE SPINOZZI, on behalf of a )
others similarly situated,          )
                                    )
              Plaintiff,            )
                                    )  3:08CV229
                                    )  AUGUST 21, 2008
        vs                          )
                                    )
LENDINGTREE, LLC; NEWPORT LENDING   )
CORP; SOUTHERN CALIFORNIA           )
MARKETING CORP; HOME LOAN           )
CONSULTANTS, INC.; and SAGE CREDIT  )
COMPANY,                            )
                                    )
              Defendants.           )
_____/

      TRANSCRIPT OF MOTION TO DISMISS UNDER RULE 12(B)(6)
            BEFORE THE HONORABLE FRANK D. WHITNEY
               UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR PLAINTIFF          GARY W JACKSON, ESQ.
                       Jackson & McGee, LLP
                       521 East Boulevard
                       Charlotte, NC 29203


                       JON LAMBIRAS, ESQ.
                       Berger & Montague, P.C.
                       1622 Locust Street
                       Philadelphia, PA 19103


                       BILLY D. GRIFFIN, ESQ.
                       Griffin Reynolds & Associates
                       416 SW 79th Street
                       Oklahoma City, OK 73139

APPEARANCES CONTINUED:


FOR DEFENDANTS        MARK S. MELODIA, ESQ.
                     PAUL J. BOND, ESQ.
                     Reed Smith LLP
                     136 Main Street
                     Princeton, NJ 08540


                     ROBERT E. HARRINGTON, ESQ.
                     Robinson, Bradshaw & Hinson, P.A.
                     101 N. Tryon Street
                     Charlotte, NC 28246



* * *


Proceedings reported and transcript prepared by

JOY KELLY, RPR, CRR
U. S. Official Court Reporter
Charlotte, North Carolina
704-350-7495

```
 1                     P R O C E E D I N G S
 2            (Call to Order of the Court at 11:06 a.m.)
 3              THE COURT:  I want to thank everyone for being so
 4     patient.  I saw some of you stay in the courtroom during
 5     argument in the last case.  That was substantive law on
 6     antitrust and it required an extensive amount of discussion
 7     by counsel for me -- for it to get through my thick skull.
 8     So we are starting 45 minutes late and I apologize -- excuse
 9     me, we're starting an hour and ten minutes late.
10              But we're here in Spinozzi v. LendingTree.
11     3:08CV229.
12              Defendant LendingTree has moved the Court to
13     dismiss plaintiff's complaint pursuant to Rule 12(b)(6) and
14     to order plaintiffs to submit their claims to binding
15     arbitration per an arbitration agreement.
16              Since it's LendingTree's motion, we'll begin with
17     LendingTree.  Each side will have 15 minutes.  And before we
18     start, I'd like counsel to introduce themselves.  I know
19     your names but I haven't connected names to faces.
20              MR. HARRINGTON:  Your Honor, I'm Robert Harrington
21     of Robinson Bradshaw here in Charlotte, counsel for
22     LendingTree, the two LendingTree defendants.  And just to
23     introduce, I have admitted pro hac vice Mark Melodia and
24     Paul Bond, and also with me, LendingTree, a member of the
25     Mecklenburg County Bar, Mark Gustafson.  Mr. Melodia will
```

1  argue.

2       THE COURT:  All right.  Mr. Melodia.

3       MR. MELODIA:  Yes, sir.

4       THE COURT:  I'll do the best I can with that.  If

5  I make a mistake, I apologize.

6       MR. MELODIA:  You would be the first judge in the

7  country to get it right, so don't worry about that.

8       THE COURT:  Let me allow plaintiffs to introduce

9  themselves.

10      MR. JACKSON:  Your Honor, Gary Jackson of Jackson

11 & McGee representing the plaintiff, and also here is Billy

12 Griffin who has been admitted pro hoc in the case

13 transferred from Oklahoma, and Jon Lambiras from

14 Pennsylvania who is involved in this case, admitted pro hoc.

15      THE COURT:  Thank you all for being here.

16      All right, Mr. Melodia.  Did I get it?  You have

17 15 minutes and you can divide it up or you can do it any way

18 you like.

19      MR. MELODIA:  Thank you, Your Honor.

20      May it please the Court.  I'm here representing

21 LendingTree on a motion to compel arbitration and to dismiss

22 the Spinozzi complaint as Your Honor referenced, in addition

23 the Mitchell and the Carson complaints as well, which have

24 been consolidated for pretrial proceedings.

25      THE COURT:  And I believe I cited the right

1    consolidated number, the 229 number.

2            MR. MELODIA:  So we're addressing and have

3    consolidated in an efficient manner each of these, but I

4    don't want to lose sight of the fact we're dealing with

5    three separate complaints, three separate people, each of

6    whom made their own contract with my client, LendingTree.

7            I guess after that last oral argument, I'm just

8    going to play for the silver (laughter) and do my best here.

9            We believe, and I think we briefed to the Court,

10   that there is a valid and an irrevocable and enforceable

11   arbitration agreement in place here under the FAA Section 2.

12   That agreement was formed, and there really hasn't been any

13   significant argument, certainly no evidence from the other

14   side, that there wasn't a contract formation of the sort

15   required, an agreement between Spinozzi, Mitchell, Carson

16   and my client.

17           THE COURT:  I don't want to upset your argument

18   but I think we all know where this is going.  How does

19   *Tillman* not apply to your situation?

20           MR. MELODIA:  First of all, *Tillman* doesn't apply;

21   but maybe more importantly, even if one applies the law of

22   *Tillman* and its holdings, that in no way changes the result.

23   We still prevail.

24           You know, one distinction right off the bat is the

25   nature of the product and service.  It was an illegal

1    product and service, according to the North Carolina General

2    Assembly in *Tillman*; that is, a single premium credit life

3    insurance payment which right off the bat puts it in a

4    different category, where the General Assembly has spoken on

5    that product; whereas there's no allegation whatsoever that

6    anything LendingTree does in terms of providing its free

7    online service, you know, is illegal or unenforceable

8    pursuant to the North Carolina General Assembly.

9         Second, and perhaps most important in terms of

10   what's lacking in this case to make out a showing of

11   unconscionability under North Carolina law, including as

12   described by *Tillman*, is evidence; any evidence of actual

13   unconscionability.  Take your pick:  procedural or

14   substantive, we need both under *Tillman*.  And the burden

15   under *Tillman* and post *Tillman* remains with the party

16   opposing arbitration.

17        THE COURT:  And that has to be done before today

18   since today is the triggering event as to go to arbitration

19   or not.

20        MR. MELODIA:  Correct.  And there has been plenty

21   of opportunity since Your Honor has seen the letters we sent

22   back in June alerting, apparently alerting counsel that

23   there was an arbitration agreement in place that is

24   available on our website to see as his clients presumably

25   did, or at least they claimed to have done so when they

1    clicked the button to accept and submit their application.

2    In other words, they took an affirmative act.  I see a lot

3    of --

4                THE COURT:  They click "accept."

5                MR. MELODIA:  "Accept" and click right above that

6    specifically that "I agree.  I've read it, and by the way

7    you ought to print it for your file."

8                THE COURT:  And I appreciate all of that and, you

9    know, the strong legal argument that that's binding, but

10   does anyone ever read those electronic contracts?  I'm just

11   wondering.  I mean, do people really know -- when they click

12   on it they are trying to get to the next step into the

13   loading of the software into their computer or whatever.

14               MR. MELODIA:  We don't know whose eyeballs or what

15   part of each document.

16               THE COURT:  The law presumes.

17               MR. MELODIA:  The law has to presume, Your Honor.

18   And this is where -- I don't want to dwell on preemption or

19   FAA, because quite frankly, as I think you could see in our

20   briefly, we're not looking for that fight.  We don't think

21   this Court is probably looking for that fight with the North

22   Carolina Supreme Court.  It's not necessary.  It's not

23   necessary because *Tillman* doesn't change the law of

24   unconscionability in North Carolina.

25               It is unique and rare in that it actually found a

1  contract to be unconscionable, and as the *Tillman* case

2  itself says that's the first time in North Carolina history

3  that an appellate court actually found a contract to be

4  unenforceable as unconscionable.  But it can't be because it

5  was an arbitration contract.  Because if that's the reason,

6  if its things about it being an arbitration contract as

7  opposed to another type of adhesion consumer contract with

8  boilerplate, admittedly boilerplate language, then it would

9  be preempted by the FAA because you can't discriminate

10  against arbitration.  That is clear from the Supreme Court

11  time and time again.

12       THE COURT:  My Supreme Court.  The U. S. Supreme

13  Court.  The one that tells me what to do.

14       MR. MELODIA:  Your Supreme Court.

15       THE COURT:  Although in this case I do have to

16  follow North Carolina law with regard to the interpretation.

17       MR. MELODIA:  Substantively we've never contested

18  that.  Our opening brief acknowledged the North Carolina law

19  applies.  In fact, the LendingTree terms of use calls for

20  North Carolina law to be applied, and we want North Carolina

21  law to apply.  And North Carolina law for us, in terms of

22  enforcing a consumer contract and not setting it aside

23  because of unconscionability is quite strong.

24       THE COURT:  Let me see if I can summarize real

25  quickly, make sure I'm understanding.

1          Your argument is that *Tillman* doesn't change the

2    law of unconscionability in North Carolina, it merely was

3    the Supreme Court saying we have -- these set of facts meet

4    what we have already said was the law.

5          And secondly you're saying it merely occurred in

6    the context of arbitration clause.  It doesn't mean all

7    arbitration clauses that come out of mass marketing type of

8    arrangements are therefore unconscionable.

9          MR. MELODIA:  Exactly.  Because if it doesn't mean

10   that, then we do have a preemption problem.

11         THE COURT:  Then we have a preemption problem.

12         MR. MELODIA:  Then you have to ignore it and you

13   have to override it.  I don't think that that's necessary

14   because I can't imagine anything in the history of the North

15   Carolina jurisprudence on these issues does not lead to a

16   conclusion that all consumer contracts in North Carolina,

17   with any limitation on remedies, with a choice of forum

18   clause, with a class action labor, that that's

19   unenforceable.

20         There's nothing in North Carolina law, North

21   Carolina Court of Appeals, to ever suggest that that is

22   where the Court intended to go.

23         The Fourth Circuit and the U. S. Supreme Court

24   clearly has gone the other way definitively and expressly on

25   most of those issues.  But let me more directly answer your

1    question on why *Tillman* is different because I think that's

2    important, in addition to the point it doesn't change things

3    anyway.

4         Part of the reason it doesn't change things is

5    because how different the facts are that were before the

6    Court there that aren't before this Court.

7         In *Tillman* not only was the product itself

8    illegal, but you had a clear statement from the majority

9    there that it is undisputed that both plaintiffs have

10   limited financial resources.

11        That the wasn't boilerplate.  That wasn't sort of

12   pie-in-the-sky attorney argument, or even an unverified

13   complaint.  That was found on specifically what

14   Mrs. Tillman's weekly after-tax take-home pay was:  $258 if

15   anybody is interested.  That her husband is deceased, and as

16   a result she receives a certain amount of pension benefits

17   and a certain amount of social security benefits.

18        Mrs. Richardson, the other plaintiff, specifically

19   works two jobs where she earns a certain amount per hour.

20   And then discussion of their assets, where the asset

21   involved in the *Tillman* case ranks among their personal

22   assets.

23        A very detailed thorough discussion of facts as to

24   each of those plaintiffs that we don't even begin to touch

25   here.

1    THE COURT:  But aren't the plaintiffs in this case

2    of average means also?  We're not talking about Bill Gates

3    being one of the injured parties here.

4         MR. MELODIA:  I have know idea.  I have no idea.

5         THE COURT:  And that's your point:  You have no

6    idea.  It has to be said today since this is the day of

7    decision.

8         MR. MELODIA:  Unless Ms. Tillman, Ms. Mitchell or

9    Ms. Carson are in the courtroom, it can't be said today in a

10   way that this Court can rely on it, and there's been plenty

11   of opportunity for that.

12        In addition, I think another key point -- and

13   there are many distinctions of -- thankfully I have some

14   good people helping me, and I have a whole chart, but a lot

15   of that is in the brief already.

16        But more importantly the one that really sticks

17   out to me, and the Court, I think, the North Carolina

18   Supreme Court, really grabbed on to this:  In *Tillman*, the

19   *Tillman* arbitration clause itself said that the AAA rules

20   didn't apply and didn't protect the consumer if they were in

21   any way contradictory of the *Tillman* arbitration clause.

22        In other words, the *Tillman* clause itself said "My

23   clause trumps the AAA rules."  Our clause in LendingTree

24   says exactly the opposite ad that's critical.  The reason

25   it's critical is everything that they are worried about,

1   that the other side talks about in a very generic way as

2   being potentially bad for their clients and bad for

3   consumers -- you know, the things like a limitation on

4   damage, a forum selection, class action waiver -- all of the

5   cost issues -- "Arbitration costs too much.  I might have to

6   pay for the arbitrator.  I don't have to pay for Your

7   Honor's time."  Those types of claims --

8          THE COURT:  But other than the cost of the

9   arbitrator versus court, arbitration is generally less

10  expensive, isn't it?

11         MR. MELODIA:  Absolutely.  And that's the reason

12  the U. S. Supreme Court has so definitively spoken in favor

13  of arbitration as favored among dispute-resolution

14  mechanisms.  That's the reason FAA exists.

15         THE COURT:  Congress created it as a preferred

16  method.

17         MR. MELODIA:  Absolutely.  Preferred and it has

18  been routinely enforced on the decades since the FAA came

19  into existence.

20         THE COURT:  Let me ask you, though, where I think

21  they might make their argument, and we're not there in this

22  case yet, but ultimately what they are asking for is a class

23  action, if they can get there, and that's where there's a

24  distinction between arbitration and federal court.

25         MR. MELODIA:  There is.

1          THE COURT:  I mean, is there a mechanism of having

2     a binding class action arbitration?

3          MR. MELODIA:  There can be, but the AAA has very

4     specifically dealt with that issue.

5          The AAA is choice of forum here that all parties

6     and the Court agree to.  And in the AAA rules the reason I

7     mention that distinction between *Tillman* and our clause is

8     because the AAA rules very specifically deal with consumer

9     cases, small claims cases, and they have a whole set of

10    rules now on class actions.  But they are very clear,

11    because this is obviously a critical issue in many, many

12    cases around the country, and since the *Basil* decision of

13    the U. S. Supreme Court, the AAA has needed to be very clear

14    about when they will and they won't consider a case to be

15    arbitrable in a class setting.

16         And what they have said is that post *Basil*, the

17    AAA will, if the parties come to it with an arbitration

18    clause that allows for expressly class actions or is silent,

19    which was the *Basil* case, is silent on the issue, they will

20    consider allowing the case to proceed in a class arbitration

21    format.

22         That isn't this clause.  They are just as clear

23    that they will not hear a case where there is a class

24    arbitration waiver.  In other words, the plaintiffs cannot

25    go to the AAA and say, "We want to take advantage of your

class arbitration rules and your panel of class
arbitrators," because they will have to present the
arbitration clause, and the arbitration clause quite
clearly, in bold, in all caps says "No class action.  No
collective action."

        The AAA -- just as clearly as our waiver is, they
just as clearly say we will not go forward with that unless
a court throws that waiver out, and that's what they would
like you to do.

        So that's going to be part of their argument,
although it hasn't been a big part of the argument they have
presented in the briefing, and part of the reason probably
for that is there are two Fourth Circuit decisions which --
specifically, *Atkins* and *Snowden*, which in 2002 specifically
held class action waivers to be enforceable.

        That's what LendingTree, as a Charlotte-based
company with a North Carolina choice of law provision
obviously was looking at when they were presenting and
drafting these arbitration agreements.  They were looking at
North Carolina law.

        This company is ready and willing to follow the
law when it's there.

        For example, you might have noticed -- it wasn't
highlighted to you in the briefing -- but you might have
noticed that Maine is carved out of the arbitration clause.

You know, why would that be?  That's because Maine has a

specific statute.  And if the North Carolina General

Assembly were to say for all contracts -- of course, not

arbitration contracts, no consumer -- you know, no consumer

class action waivers period.  Okay.  If it's generally

applicable, I'm sure there's a lot of people that wouldn't

like that clause, but, you know what, there are a lot of

things that the North Carolina General Assembly does that

different people don't like.

        Yesterday the North Carolina General Assembly was

the first legislative body in the country to outlaw yield

spread premiums in mortgage transactions.  And that's a

dramatic act.

        People in the banking industry, you know, might be

fighting that in one way or another, but if that law is

valid and upheld, then, you know, that's the law of North

Carolina and that will get written in.

        Similarly the North Carolina General Assembly

isn't afraid to protect consumers when it feels it's the

right thing to do by outlawing single premium credit life.

North Carolina was one of the first states in the country

with an antipredator lending law.

        So the General Assembly knows how to act.  It

knows how to protect consumers.  And yet all of the things

that supposedly lend to the argument of unconscionability

1  coming from the other side are things that are not illegal,

2  are not unenforceable in general consumer contracts.

3  Now, is it possible for a contract to have so many

4  factors weighing on procedural and substantive

5  unconscionability that the contract becomes unenforceable?

6  Obviously, yes. *Tillman* for the first time that result was

7  reached.

8  The other big set of factors I haven't mentioned

9  yet in *Tillman* that don't exist here is that it was at a

10  closing. There was a stack of papers. There was again

11  undisputed testimony about somebody virtually forcing the

12  person's hand on to the paper. There was pressure. There

13  was coercion of the sort one could find unconscionability

14  arising from.

15  This is an online activity freely chosen, and by

16  the way, free; not just freely chosen but free.

17  They went to this site. It's a passive site.

18  They went to it. Each of these three ladies decided to look

19  at it. Not only did they look at it but they chose to take

20  the next affirmative step of actually submitting their

21  personal information and application.

22  That's obviously what gave rise to their claim

23  that that personal information wasn't properly treated. But

24  that obviously is a dispute that is squarely within the

25  ambit of the arbitration clause.

1          By taking that affirmative step, clicking on that

2    button, saying, "I accept.  I've read the terms of use," the

3    very first paragraph of terms of use -- I mean, they don't

4    want to read what is admittedly a long document, to Your

5    Honor's earlier point about how practical is it that people

6    are going to read the entire contract -- I mean, the same

7    thing could be said about real estate closings or any other

8    situation except at least here --

9          THE COURT:  That is true.

10         MR. MELODIA:  -- they can print out their own.

11         THE COURT:  I don't know -- I've been to many

12   closings and I've never seen anyone read --

13         MR. MELODIA:  Here, Your Honor, this is much less

14   pressure.  You don't have the people sitting there.  A clock

15   isn't ticking.  A lawyer isn't charging you for his time

16   while you read.  This is your in your pajamas at 2:00 a.m.

17   or whenever you chose to surf the Internet to look at the

18   LendingTree site.  You can print it out.  You can look at it

19   online.  You can move it around.  You know what, if your

20   eyes are bad, you could blow the point up to 30-point type.

21         The whole idea of it being a static small print

22   contract like all of us are used to at a real estate closing

23   is obsolete.  You can change it to make it readable to you.

24   You know, probably if you exported it and put it on another

25   site you could change it into, you know, Finnish.  You could

1  translate it.  So I mean there's an ability to understand

2  this document and take your time that doesn't exist normally

3  and it's clearly distinct from *Tillman*.

4          THE COURT:  All right.  You've used 23 minutes.

5          MR. MELODIA:  If I could have a minute or two

6  after --

7          THE COURT:  That will be fine.

8          Mr. Jackson, you have at least 23 minutes.

9          MR. JACKSON:  Thank you, Your Honor.  I hope it

10  won't use that time.  And I hope I can vie for a silver.  If

11  I don't even get a bronze, I'm in the bad shape.  (Laughter)

12          I think that we all recognize that our state, and

13  general the country, has a strong position in favor of

14  arbitration.  But our state also has a strong position in

15  allowing its citizens to have a viable forum where they can

16  have their grievances or claims addressed, and I think

17  that's what *Tillman* is about.

18          I think there are two issues before the Court.

19          One is does the pleading, or the three pleadings,

20  satisfy Rule 12?  Did we sufficiently plead the elements

21  that we needed to to get out of the arbitration which we

22  think was an unconscionable provision.

23          Secondly, if we did, and I think we certainly did,

24  was there something else we were supposed to do?  Were we

25  supposed to put on evidence?

1    THE COURT:  That's a very interesting question.  I

2 mean, *Tillman* has a lot of facts in it.  It's a juicy

3 decision when it's based on the point early in the

4 proceeding where the decision to go to arbitration or not go

5 to arbitration is made.  Is there now, under *Tillman*, a

6 requirement to have a mini trial as to arbitration?

7    MR. JACKSON:  I don't know the answer to that, but

8 I'll submit this:  One, there are a number of things that

9 you can look at in the various elements that *Tillman* lists

10 that probably don't need evidence.  For example, do we have

11 to go to post LendingTree to learn that they would not have

12 entered into an agreement without the arbitration clause.

13 Maybe we do.

14    The reason that these cases like *Tillman* and Pay

15 Day Lending cases were -- had such a rich factual

16 development is because they were at a different stage.

17 These decisions were not made -- they were made on a

18 motion -- in *Tillman* a motion to compel arbitration and then

19 they had the extensive discovery.

20    In Cougan (ph), which is the recent court of

21 appeals opinion in May, which said we're going to send these

22 Pay Day Lending cases back to Judge Hooks (ph),  but with

23 *Tillman*, the *Tillman* factors that he needs to consider.

24    There there was extensive discovery because there

25 was a class served, and there were in that case over 20

1   lawyers who were deposed to say, "I'm a consumer lawyer.  I

2   couldn't take this case."  So there was -- whether here we

3   have to do that, Your Honor, I don't know.

4         The cases that they cite which say that, "Okay, we

5   filed a Rule 12(b) motion but under the FAA we have a right

6   to convert it to centrally summary judgment motion or a

7   motion to compel arbitration."  The names don't make any

8   difference.  That's what some of the cases say.  But in

9   those cases they also say -- and I'm quoting the one case,

10   Santos (ph) which they cite, "Both parties have had the

11   opportunity to develop the factual record sufficient to

12   resolve the issue of arguability."

13         The other case that they cite is *Brown v. Dorsey* &

14   *Whitney*, and there the Court says, "The Court need not

15   consider matters outside the pleadings at all. But once it

16   decides to consult such matters, it should so inform the

17   parties and set a schedule for submitting additional

18   affidavits and documents if the parties wish."  And this was

19   an arbitration case.

20         So I guess how I would answer that is although we

21   don't think that a hearing is necessary or submission of

22   affidavits or a factual inquiry, it may be.

23         THE COURT:  But, well, my concern is you basically

24   point to *Tillman* and then turn back and say unconscionable.

25   This is unconscionable.  Don't you have to prove something

1  to get to the unconscionability versus just saying we have

2  our complaint, or complaints in this case, and we're all

3  small consumers, and LendingTree is a big guy, and this is

4  an Internet access contract.  That's in our complaint and

5  that's enough.  Does that -- then you say that's

6  unconscionable.  Unconscionability seems to me to be a very

7  serious determination by a court based on a real egregious

8  set of facts.  How do I get those facts?

9       MR. JACKSON:  Well, to answer the first question,

10  I think that we have satisfied the pleading requirement.  We

11  come over here and say, okay, you satisfied the pleading

12  requirement.  How -- do I compel arbitration based upon the

13  pleading.  Do I not compel arbitration?  And I'll agree with

14  you that even though *Tillman*, and the Pay Day Lending cases

15  and most of these other cases were in a different posture

16  than we were today.  In all of these cases there was a rich

17  factual development.  And I think once we went through that

18  exercise of discovery or affidavits, however we went about

19  it, we would meet -- I think our case is stronger than

20  *Tillman*.

21       THE COURT:  It's interesting we're having to

22  argument, this discussion, because it really is I think very

23  important.

24       To get to *Tillman* you've got to have a lot of

25  facts.  I mean, I think the biggest thing that struck me in

1    *Tillman* was there were 68,000 loans and there wasn't a

2    single arbitration, and I think that struck the North

3    Carolina Supreme Court also.  But, you know, I have no idea

4    how many people have allegedly been injured here.

5            Do I end up costing both parties the cost of a

6    mini trial or additional discovery to get to arbitration

7    when the very purpose that the U. S. Congress created the

8    Federal Arbitration Act was to avoid running up costs of

9    litigation.

10           So I mean -- and that gets me back to what

11   Mr. Melodia said, is that am I going to be torn, pushed into

12   the direction of preempting North Carolina law, because if I

13   don't read *Tillman* and Federal Arbitration Act together,

14   then I suddenly have to say *Tillman* undermines the very

15   purpose of Federal Arbitration Act because I'm running up

16   litigation costs instead of running them down.

17           MR. JACKSON:  Well, one, I think *Tillman* is the

18   law in North Carolina.

19           THE COURT:  Substantive law in North Carolina.

20           MR. JACKSON:  Substantive law of North Carolina.

21   And I think that there are ways to chart discovery on these

22   discrete issues, issues that *Tillman* sets forth.  The cost

23   of arbitration are prohibitively high.  I mean, common sense

24   tells you that even if you are Bill Gates, if you stand to

25   get $100 or $500 at the end of arbitration as recovery,

1   you're not going to invest attorney's fees.

2          THE COURT:  I totally agree with you, the economic

3   argument, but isn't in general -- let's exclude the class

4   aspects of this -- in general isn't arbitration cheaper than

5   being in federal district court?

6          MR. JACKSON:  Honestly it depends.

7          THE COURT:  And then that gets us back to you have

8   to do discovery --

9          MR. JACKSON:  We did finish a class action

10  arbitration with the AAA this year.  It took three years,

11  and the parties together paid the arbitrator $200,000 and

12  there were lots of other costs.

13         So the sort of blanket assessment that when you

14  have these kind of claims that arbitration is better is not

15  something that I accept.  It doesn't mean --

16         THE COURT:  And your point is very well taken.  I

17  totally understand what you're saying.  It puts me back in

18  my dilemma here of going -- once again one of the issues to

19  get to a *Tillman* result of a finding of unconscionability is

20  of factual finding by this Court that arbitration is either

21  no cheaper or even more expensive than staying in this

22  Court.  And it twists me back into going, well, I've got to

23  have -- I mean, does *Tillman* compel me to do a mini trial or

24  extensive discovery with a quasi summary judgment finding,

25  you know, post discovery finding on the issue of what

1   qualifies as unconscionable.

2          MR. JACKSON:  I would hope that we would not have

3   to go to the evidentiary hearing because, for example, in

4   the Murray (ph) case, Fourth Circuit case, motion to

5   dismiss, and the Court looked at the motion and pleadings

6   and sent it back.  We may be in a different world now with

7   *Tillman*.  But I don't think -- I think you can harmonize the

8   rational for arbitration and say, okay, maybe at the end of

9   this it goes to arbitration and still respect the claimants'

10  right to resist arbitration without it being some hugely

11  expensive affair.

12         And one way that that can be done is you look at

13  the *Tillman* factors and you -- I think there's some of these

14  things we can stipulate to -- ad certainly -- if we could

15  have a discovery order which was sort of, you know, a way to

16  get to these facts which are *Tillman* important, and I think

17  we could, maybe that's the way to answer it.  Just like if

18  you had a jurisdictional question where you had to engage in

19  fact-finding before you decided on jurisdiction.

20         THE COURT:  But I see a distinction there.

21         When we're debating jurisdiction I have to do some

22  fact-finding, we're not sitting there talking about costs.

23  I mean, one of the -- there are multiple reasons that

24  Congress enacted the Federal Arbitration Act, but one was

25  ultimately less cost of litigation, although that might not

1    always be true.

2            Another was so that federal courts' time to be

3    freed up and focus on more pertinent issues for the U. S.

4    Government, so the U. S. Government can prosecute criminal

5    cases, the U. S. Government can handle civil litigation

6    because the U. S. Government doesn't go into state court to

7    resolve its issues.  So that's why my jurisdiction over

8    civil cases is extremely narrow.  I am a court of limited

9    jurisdiction.  So Congress was saying Federal Arbitration

10   Act frees up judges to do traditional federal court

11   business.

12           MR. JACKSON:  Unlike the class action parasite.

13           THE COURT:  Well, you're right.

14           Congress said in that case I have jurisdiction

15   over something I never had until then and I'm supposed to

16   swoop down and take the class actions.

17           MR. JACKSON:  We're not saying that there can

18   never be an arbitration agreement between a consumer and

19   another party.  But once the defendant drafts the

20   arbitration provision, and it includes things that make it

21   essentially impossible for a claimant to ever exercise his

22   or her rights to have it disposed of, then I do think that

23   it's appropriate for the Court to undertake an evidentiary

24   evaluation on the issue of conscionability.

25           THE COURT:  Let me ask you:  If you were to go

 1    back and amend your complaint and you file a verified

 2    complaint and you filled in all the missing data about your

 3    client's economic status, net worth, income; and based on,

 4    you know, good faith allegations saying we think there's

 5    2,000 people out here, or 5,000 out here similarly situated,

 6    would that improve your situation?  You're saying you've

 7    pled enough, but would you be in better shape if you had a

 8    verified complaint with all that stuff in there?

 9         MR. JACKSON:  I think it improves our situation.

10    I think if there are -- there still might be questions, if

11    we're going down the evidentiary road, as to the practices

12    of the defendant, issues to which we may not be privy.

13    Issues like would they enter into a arbitration agreement?

14    Would they force the consumer to enter into the arbitration

15    agreement.

16         THE COURT:  My concern is that we end up having

17    almost two parallel litigations.  And I understand

18    everything you're saying.  I think your points are

19    well-taken.  I believe I'm the first district court in North

20    Carolina to have to deal with *Tillman* vis-a-vis the Federal

21    Arbitration Act in a consumer contract context.  And it's --

22    you know, I wish it would be one of my friends.  I'm the one

23    that got it.  Now I see why Judge Conrad recommended --

24         MR. MELODIA:  I was about to say that was one of

25    your friends, Your Honor.

```
 1            THE COURT:  He was more -- when I said, "Sure,
 2   Bob, I'll take these cases," he was more aware of what was
 3   coming than I was.
 4            MR. JACKSON:  Can I just add this?
 5            THE COURT:  Please.
 6            MR. JACKSON:  If they had come before us with a
 7   motion to compel arbitration, I think that's what happened
 8   in Tillman.  I mean in these other -- and the courts there
 9   did decide arbitration may be important, but if it's not an
10   enforceable arbitration agreement, then these folks need
11   some remedy and our court system provides that remedy and
12   we're going to allow them this discovery.
13            So I think that it's important to address those
14   evidentiary questions if we need to, and I don't think that
15   any interest in favor of arbitration outweighs that.  In
16   fact, we haven't each gotten to that.  But fortunately we
17   haven't got to that point because we don't know if the
18   arbitration clause is enforceable or not.
19            THE COURT:  Well, see that's the problem exactly.
20   I mean I totally concur.
21            You don't have to answer this question, I'm going
22   to leave it up to you exercise your client's Fifth Amendment
23   rights:  If there was not a waiver of class certification in
24   the contract, would you be fighting so vigorously against
25   enforcement of the arbitration clause?
```

         MR. JACKSON:  I think I would be fighting against
it if -- and I have a different view than Mark on the
ability of an arbitrator to look at the state law that's
applicable and decide whether the class action ban in the
arbitration agreement is enforceable.  I don't think an
arbitrator can do that.

         But in my experience having just been through a
class action arbitration, I can tell you that it's not less
expensive than our court system.  So I think I would still
be resisting on the basis --

         THE COURT:  I certainly can understand when you
have the lengthy arbitration and you're paying the bill to
the arbitrator that you're going to run up that expense.
There's no doubt about that.  But it should save -- it
should, in theory, save money in legal fees.  It should save
money in transportation of witnesses; there's a lot more
flexibility there.  And as you probably are aware, I run a
tight docket so when you come into my courtroom you start
running and you run until you get to the end, which I think
saves costs but some people say otherwise.

         MR. JACKSON:  Well -- and not to -- I have been on
an arbitration panel for a long time and not to malign
arbitrators, but we -- some of these arbitrators on the
panel for class action, many of them are retired.  You have
three.  And you -- they have an incentive to make these

1    cases last as long as they can, so it is hugely expensive to

2    go through a class action arbitration these days.

3            Can I say three more things in response?

4            THE COURT:  Sur.

5            MR. JACKSON:  I don't know if I've used all my 23

6    minutes.

7            THE COURT:  Oh, don't -- you all were so patient

8    with me, I'm patient with you on time.

9            MR. JACKSON:  The first point is that whether the

10   practices in *Tillman* were illegal or not is really

11   irrelevant.  But they weren't.  The practices were not

12   illegal until July 1st 2000.  So, the suit was, alleged

13   practices at the time that the company was engaging in them,

14   I guess in *Tillman* -- they were not.

15           Ability to pay.  I did not attend the *Tillman* oral

16   argument before the Supreme Court but I read about it, and

17   one of the questions that Justice Newby asked --

18           THE COURT:  Who dissented.  He very proudly

19   dissented.  He goes around and speaks about his dissenting

20   in *Tillman*.

21           MR. JACKSON:  Well, it's interesting because

22   defense counsel said Ms. Tillman said in her deposition that

23   she tithed 10 percent to her church.  If she could do that,

24   she can pay.  She has an ability to pay.  That's Justice

25   Newby, asked some pretty hard questions, even though he did

1   dissent.

2           THE COURT:  He's actually a nice guy even if he

3   sounded tough in the colloquy there.

4           MR. JACKSON:  But the point being that, yes, we

5   can put on evidence about ability to the pay, and these

6   places don't have the ability to pay, but running through

7   *Tillman* and all these cases is let's see is it ability to

8   pay?  Willingness to pay?  Is it reasonable to pay?  Does it

9   make sense to pay a lawyer $1,000 or $5,000 or take the risk

10  of incurring costs and paying attorneys' fees if all I'm

11  going after is $100 or $500?  So I think that that ability

12  to pay issue is off base for a couple of reasons.

13          And finally I think our case is stronger than

14  *Tillman*.

15          In *Tillman* you had -- Mark makes a big point about

16  being rushed through the loans and forced to sign.  Well,

17  she had it before.  She saw it.  She had a three-day

18  recision right.

19          Now, in our case there was an opportunity to see

20  it.  But if you go on certain websites, some of them make

21  you read it.  And these folks didn't do that.  I mean, we

22  agree that we would go right past the terms of use and they

23  didn't see the contract.  But it was much more of an

24  opportunity, a realistic opportunity to see this stuff, to

25  see the arbitration agreement in *Tillman* and Pay Day Lending

1    cases.

2          So I think that ultimately if we do go through

3    some sort of evidentiary exercise that that's one of the

4    things that's going to come out.

5          So I -- maybe I'll answer more questions but

6    that's pretty much the gist of my argument.

7          THE COURT:  I'll give you a little rebuttal since

8    we're not -- a surrebuttal after rebuttal.

9          MR. MELODIA:  Thank you, Your Honor.

10         Let me just hit a couple of points here.

11         One, we pick up with the three-day recision

12   period.  I mean here it's almost like you could have a

13   three-year recision period.

14         There's no need to do this particular closing.

15   There's no need to go to this particular website.  There's

16   no need to, and nobody is forcing you, to access this

17   particular free online service as compared to all the others

18   we listed in our reply brief.  Or what about this:  Walking

19   across the street and going to a mortgage office or going to

20   your local banker if you prefer face-to-face contact; you

21   don't like computers.

22         There are lots of options, lots of way to get

23   mortgages.  We all know that.  This is just one of the ways.

24   And this company has chosen, you know, to limit its

25   liability and limit the places in which it has to litigate.

1    And that is part of the economics behind the free service.

2    And I'm not just making, you know, an University of Chicago

3    argument here, Your Honor, this is the U. S. Supreme Court

4    recognize this in the Shuts (ph) Carnival Cruise case.

5            THE COURT:  Judge Posner might have been helping

6    the Supreme Court.

7            MR. MELODIA:  Perhaps there's a little influence

8    there, but nonetheless it's the U. S. Supreme Court.  And

9    they concluded in the Carnival Cruise Line case you need to

10   pay attention to the limitations on certain rights and

11   certain costs and forum selection clauses -- that was the

12   issue in Carnival Cruise -- that the company has contracted

13   for because that's part of their cost structure; that's part

14   of the way in which they set up their business.

15           Nobody has to go on Carnival Cruise as opposed to

16   another one.  Nobody has to go to LendingTree.  But if you

17   chose to, if you want to do business, like the website says,

18   with us, don't go any further, don't use this website if you

19   don't agree to these terms.  If you do, then you bought into

20   our approach to this business.

21           And as long as that approach isn't unconscionable,

22   you know, which it isn't, then -- or somehow so outside the

23   norm in terms of what is enforceable in the arbitration

24   context, then we can't be second guessing.

25           The other thing we can't do in North Carolina is

blue pencil.  So all the discussion about, you know, that we

could be looking at how good are the class arbitrators.  Who

cares?  We're not going there.  That's not the choice.

Because we can't blue pencil.  We can't send this case to

arbitration as a class action because you can't strike a

piece of this.  It's up or down.  You can't get into the

business, under North Carolina law, of blue penciling and

rewriting the deal.  The deal is either conscionable or it

isn't.  I win or I don't.

          THE COURT:  And I understand win or don't win.

I'm still -- my -- really my big concern, I guess it's

obvious, is how do you get there.

          MR. MELODIA:  Let me address that.

          THE COURT:  And you're saying they have to do it

by today and it's got to be well pled with the level of

specificity that there was in the record of *Tillman*.

Mr. Jackson saying, "Well, we think we pled enough.  But

even if we didn't plead enough, we really get an opportunity

to do some evidentiary discovery or we get to go back and

add a lot more to an amended complaint with all sorts of

affidavits."

          MR. MELODIA:  Right.  Let me address that because

luckily it's not me saying it, it's the Congress, and the

U. S. Supreme Court saying these things.  It's the FAA

Section 6 which specifically sets out a procedure.

```
 1              THE COURT:  Okay.
 2              MR. MELODIA:  Which is the procedure to be used in
 3    this setting.  And while Rule 12(b)(6) gives me the right to
 4    walk into this courtroom and talk to you about this
 5    motion --
 6              THE COURT:  That's actually a separate question.
 7    I'm wondering 12(b)(6) the right --
 8              MR. MELODIA:  It's the vehicle.
 9              THE COURT:  Well, is it, or can you just -- does
10    it have to be 12(b)(6) or it's just a motion to compel
11    arbitration?
12              MR. MELODIA:  Well, I heard that from Mr. Jackson.
13    I don't follow that only because I have been making this
14    motion or some version of it for at least ten years and it's
15    always been a 12(b)(6).
16              THE COURT:  But the ultimate of 12(b)(6) is
17    dismissal, but that's really not what the FAA gives as
18    remedy, doesn't it, it's staying --
19              MR. MELODIA:  It talks about staying.  And there's
20    been a lot of case law all over the place whether it's a
21    stay or a dismissal.
22              But the FAA importantly sets out a procedure in
23    Section 6 for dealing with the debate we're having here, and
24    the challenge of, you know, what do you need in front of you
25    to make this decision.  And it talks about not a 12(b)(6)
```

```
 1   four corners of the complaint test, you know, it clearly
 2   looks beyond the pleadings and looks to, you know, the
 3   taking of evidence, if necessary, in order to, you know,
 4   to -- in order to go there and make a decision.  It could be
 5   summary judgment, but what's the point of that?  Let's deal
 6   with Twombly, which hasn't been mentioned amazingly, a Rule
 7   12 motion, when's the last time that happened by defense
 8   counsel.  So let me mention *Twombly*.
 9           THE COURT:  We discussed it a lot in the last
10   hearing.
11           MR. MELODIA:  It is important.  I want to address
12   specifically whether these complaints would pass a *Twombly*
13   test.  They clearly don't.
14           The Mitchell complaint has nothing about any of
15   this.  So is it plausible that an unconscionability argument
16   could prevail in Mitchell on the complaint?  Absolutely not.
17           The other two, Spinozzi and Carson, make an
18   attempt but the attempt they make is exactly what *Twombly*
19   was passed to avoid.  It's boilerplate, lifted straight out
20   of *Tillman*.  It's legal conclusions lifted straight out of
21   *Tillman* as if they were factual pleadings.
22           That's not enough under Twombly.  That's does not
23   pass the Rule 12(b)(6) test, and it also doesn't come even
24   close getting close to the FAA Section 6 and case law
25   interpreting FAA Section 6 as to what's required here.
```

1          So I heard a little bit of talk about maybe

2    there's some information from the defendant that could be

3    important to have if we go down this evidentiary road.  But

4    the information that *Tillman* says is important is all in the

5    control of these parties.  We have been --

6          THE COURT:  Well, except for the number, the vast

7    number of potentially injured parties.

8          MR. MELODIA:  But that isn't important in terms of

9    whether Ms. Mitchell, Spinozzi and Carson ought to go

10   arbitrate their dispute, which they agreed to do

11   individually.  Because really the issue of whether or not

12   they would be proceeding to arbitration or not, or fighting,

13   and the issue of whether they are -- I think Mr. Jackson

14   said that the LendingTree arbitration contract makes it

15   impossible to exercise their rights to be heard -- that's

16   really not the case.

17         A careful look at the LendingTree provision

18   actually shifts feeds to the company on all counts of their

19   complaint if they prevail.

20         So, Your Honor, if they have a meritorious claim

21   individually, and they go to arbitration, they are better

22   off than if they stay in front of Your Honor because in

23   front of Your Honor they have a complaint which has one

24   cause of action which has fee shifting.  The FCRA.  Period.

25         If the FCRA claim goes away, which in our view it

1    would be the first to go away, they are left with a common

2    law bunch of claims that don't allow for fee shifting and

3    they are defending this in court which Congress has decided

4    is more expensive and more time-consuming and burdens the

5    federal court, which is more important than what everybody

6    else thinks today about what is or isn't more efficient, and

7    they would be stuck with their attorneys' fees, win or lose.

8              If they go to arbitration under the LendingTree

9    agreement, the fees are shifted to us if they win on all

10   counts.  Okay.  That's a benefit in this agreement that they

11   don't have in court, which I think should be highlighted.

12             So I think the other thing in *Twombly* that I think

13   is worth noting is that the U. S. Supreme Court talks in

14   *Twombly* about the reason they need to toughen up the

15   standard at the front end on Rule 12 is because they said

16   90 percent of the cost of litigation, that's probably

17   consistent with all of our experiences, is in the discovery

18   stage.  So Your Honor's concern about starting down that

19   discovery path, in terms of talking about the enforceability

20   of a contract which by its nature is intended to prevent

21   that expenditure of time and effort, we are undermining the

22   entire purpose of the contract between the parties, and

23   we're undermining the FAA and federal congressional intent

24   to allow for a quick resolution of the issue.

25             Now, how do we get there?  How can we make these

things fit together?

I think the answer lies in what I began to talk about but didn't really, which is the difference between *Tillman* which says the AAA rules don't apply if they are inconsistent with my contract. And the LendingTree contract which says we embrace and bring in the current version of all of the AAA rules into our agreement and into our agreement.

That is a fundamental difference on this point because Your Honor doesn't have to tackle the issue of the costs, for example. That, according to the U. S. Supreme Court and the Buckeye Check Cashing case, is for the arbiter. Your Honor doesn't need to decide whether North Carolina is the proper place for a New York or California or Oklahoma person to be brought for proceedings. The arbitrator has the ability to decide that because there are consumer due-process provisions within the AAA rules, and we've attached them to our motion papers, which specifically address every one of those concerns.

The only concern that the AAA rules say has to be left to the federal court is the issue of the class action waiver. That's the only one. All the other are ones that -- I don't want to say "punt" because that makes it sound like you're not doing your job -- you're doing your job sending it quickly and promptly if it is met -- if it is

a valid, irrevocable and enforceable agreement under Section

2 of the FAA, which on the papers in front of Your Honor,

this is.  And there is no evidentiary or other basis to

believe that it isn't.

Then the only issue Your Honor has to decide is is

there something about the case action waiver here which is

unenforceable.  Everything else could be presented to the

arbitrator and the arbitrator might decide, you know what,

for Ms. Mitchell from Oklahoma, it's not fair to make her do

this arbitration in Mecklenburg County.  It ought to be back

in Oklahoma City.

You know, and maybe there are certain

circumstances, and we've put these in the papers attached to

the brief, where the arbitrator could act pro bono or the

LendingTree, the defendant, might be required to pick up not

just the first day but every day.

Those are all things that the arbitrator can do

and all things that LendingTree has submitted itself to the

possibility, and that is all pro consumer.  That's their

protection.  That's where their protection is.  It isn't

here.

And on these facts before Your Honor, there's

really no way -- I mean there's no way, and I think Your

Honor can recognize that -- to find unconscionability.  So

the question is do you allow them to go back and amend and

```
 1    amend and amend and come forward and then serve discovery,

 2    and U. S. Supreme Court says, the FAA says, Twombly says

 3    that is a road that should not be taken because it defeats

 4    the very purpose of an arbitration agreement.

 5              THE COURT:  Let me ask you:  I know the argument

 6    you just made said that amending, amending, amending is

 7    inconsistent with the Federal Arbitration Act.  Even if

 8    amending occurred, those are still disputed facts.  And in

 9    Tillman I don't believe the facts on which the Supreme Court

10    made its decision were disputed.

11              MR. MELODIA:  That's correct.  They said it was

12    undisputed.

13              THE COURT:  Undisputed.

14              So, you know, other than the financial wherewithal

15    of the plaintiffs personally, all the other allegations in

16    the complaint would necessarily have to be disputed; the

17    vast number of potential plaintiffs out there, the very

18    issues we have been discussing today, what's more pressure

19    on a consumer, sitting at home on his or her computer and

20    clicking on reading a document and accepting a document they

21    probably didn't read, or being at a closing where there's a

22    lawyer, real estate agent there that might advise them as to

23    what boilerplate means.  Even if all of that is verified in

24    the complaint, it's still going to be a disputed fact on

25    your side.  You're going to disagree with all of it.
```

```
 1            MR. MELODIA:  Absolutely.  And that's the reason
 2   you can't go there, Your Honor.  That's the reason the
 3   unconscionability law in North Carolina requires so much
 4   more than that anyway.
 5            I mean, we can't be in the business, even this
 6   Court cannot be in the business of judging which one has
 7   more pressure behind it:  Ms. Mitchell in her pajamas
 8   checking out the Internet versus being at a closing,
 9   three-day recision period versus the right to go to any
10   other website in the world.  Because those are judgment
11   calls that, you know, really get us into an area that, you
12   know, doesn't lead to unconscionability anyway.
13            Because you look at the unconscionability law in
14   North Carolina, I mean, the beauty pageant case, the Little
15   Red Home School case, the nursing home case -- I mean all of
16   those cases from the Court of Appeals that deal factually
17   with unconscionability arguments, you know, would not begin
18   to touch and declare unconscionable, you know, even their
19   allegations, even if they were undisputed is my point, it
20   doesn't get them there.
21            Because the only things that are really in their
22   complaint are the things that come straight out of the legal
23   conclusion section of *Tillman*, not facts.  They didn't lift
24   facts from *Tillman*.  They can't.  They lifted legal
25   conclusions from *Tillman*.  And that's exactly what *Twombly*
```

1    says is not okay.

2          And here we are, I mean, three months after

3    starting to talk about this issue and alerting them.  And

4    these are issues in their control.

5          Today is the day for determination on this.  We

6    think there ought to be dismissal of all three, Mitchell

7    being the easiest case, but all three fall well short of the

8    burden that is theirs.  Remember again the FAA governs who

9    has the burden, and the U. S. Supreme Court has said they

10   have the burden of production and persuasion, and where is

11   it?

12         THE COURT:  Thank you very much.

13         Mr. Jackson, take all the time you need.

14         MR. JACKSON:  Okay.  I hope to be short, but I've

15   got a bunch of things to address.

16         First of all, Mark mentions they was cases in

17   North Carolina.  These Court of Appeal cases about

18   unconscionability.  And they mention them in their reply

19   brief.  They try to say those cases stand against declaring

20   the clauses here unconscionable.

21         But the *Tillman* decision in great detail analyzed

22   all of those case and harmonized them.  Our case is a lot

23   closer to *Tillman* than it is the nursing home case or the

24   school case.  And I would just say that reference to these

25   cases, North Carolina cases, it's way off the mark.

1    Basically what they are telling you is you do not
2    have the ability to decide whether an arbitration clause is
3    unconscionable or not.  Try to think of a clause that is
4    worse than this one.
5        They're saying that you can't take evidence -- you
6    can never, under any circumstances, declare an arbitration
7    clause unconscionable.  And I'd just suggest that's wrong,
8    and I'll address some of their points that I disagree with.
9        They could have gone elsewhere.  These folks could
10   have gone to some other service.
11       Well, in the Pay Day Lending cases they could have
12   gone to another Pay Day lender.  Ms. Tillman could have gone
13   to another bank or finance company for a loan.  That's
14   irrelevant here.
15       The FAA does set forth the procedure, but what it
16   says -- I -- it's the first time in my experience that I
17   have had a defendant want to get out of court and go to
18   arbitration with a 12(b)(6) motion.  And I guess Mark's
19   experiences are different.
20       But the cases I have read that they have cited are
21   cases that say if you bring the 12(b)(6), and you invoke the
22   FAA, then you can convert it to summary judgment or a motion
23   to compel but there needs to be a factual record at that
24   point.  And if there's not a factual record, their cases
25   suggest that you have to have an opportunity to develop one.

1          I would also ask that in terms of the financial

2     viability, the competing considerations of the Arbitration

3     Act and the claimants who want their day in court, that you

4     look at the entire dispute; you look at the numbers here.

5     You look -- this is not one consumer coming forward, and if

6     this is a class -- this is an attempt to have a class of

7     many, many people and have their grievances addressed.

8          Let's say this was filed as an individual action

9     and Ms. Carson came forward and then they made the same

10    motion.  I'm not saying that there shouldn't be an

11    evidentiary examination of the unconscionability factors,

12    but what I am saying is that case is different than a case

13    like this where I think that the evidentiary issues could be

14    very economically, discretely, quickly addressed if they

15    needed to be.

16          Now, he's mentioned that I said it's impossible to

17    invoke your rights under this clause.  It's not impossible.

18    It's practically impossible.

19          The reason that you see in *Tillman* nobody using

20    the arbitration procedure is the same reason that you would

21    see here nobody using the arbitration procedure.  You go

22    back to the factors in *Tillman* about costs and whether

23    attorneys are going to take the case and loser pays and all

24    these other things; the fact is people are not going to

25    bring those claims.

1      You know, I imagine that they would be saying the

2  same thing that we heard in the *Tillman* case; that the

3  defendant there said that this is pro consumer.  They have

4  provided this arbitration opportunity and it's pro consumer.

5  That's what they always say.  If it's pro consumer, then why

6  didn't any consumer use the arbitration provision in

7  *Tillman*?

8      I just submit to you if these cases go to

9  arbitration there will be no cases.  So all of his points

10  about the arbitrator can do this, the arbitrator can do that

11  are hypothetical because there wouldn't be an arbitrator

12  because of the impediments and obstacles that keep these

13  people from invoking that.

14      Now, I would just ask in closing here for you to

15  look at the bogus factors of procedural and substantive

16  unconscionability that were outlined in the *Tillman* case.

17  And I don't think that they are evidentiary challenging.

18      The arbitration clause was not brought to the

19  plaintiff's personal attention by the defendant.  We know.

20  We could stipulate what happened here.

21      The arbitration clause is a standard boilerplate

22  clause which defendants include in all loan documents.  We

23  could stipulate to that.

24      There was no opportunity for the plaintiffs to

25  negotiate the terms in the arbitration clause and the

1　defendant would not have so negotiated.  That's not going to

2　be evidentiarily demanding.

3　　　　　There was unequal bargaining power between the

4　parties and that the plaintiffs were relatively

5　unsophisticated consumers contracting with corporate

6　defendants.  I think we know who the people, the plaintiffs

7　class members are and who LendingTree is.

8　　　　　Substitute unconscionability.  The cost of

9　arbitration are prohibitively high.

10　　　　　Well, it was relatively -- we can turn to the

11　findings in the *Tillman* case about what the average

12　arbitrator, AAA arbitrator, is going to cost in North

13　Carolina or we can reinvent that pretty quickly and

14　efficiently.

15　　　　　The plaintiffs have small damages.  We know that.

16　We could stipulate to that.

17　　　　　Because Plaintiff's damages is so low, it's

18　unlikely any attorney would be willing to represent them in

19　arbitration.

20　　　　　Well, I know my standing up here and saying that I

21　wouldn't represent them in arbitration is not going to be

22　compelling, but if we use common sense and if we have to go

23　do what they did in the Pay Day cases and get 20 depositions

24　of consumer lawyers, you know, I think that's unnecessary.

25　I think there are ways that we can establish that attorneys

1   are not going to take these cases that are not going to be

2   time consuming or expensive.

3           The above point is especially true, and that is

4   attorneys won't take the cases, where the arbitration clause

5   prohibits the joinder claims in class actions.  The

6   arbitration loser pay provisions create a barrier.

7           Mark made a big deal of the fact that if these

8   people win in arbitration, then LendingTree is going to pay

9   their cost.

10          Well, that's loser pays, and loser pays is an

11  impediment.  If there is a risk, as we all know there's

12  always a risk in litigation or arbitration, that you're

13  going to be responsible for the other side's attorneys' fees

14  in addition to your own, then that's an impediment,

15  particularly in small claims.

16          THE COURT:  And that's intended to be impediment.

17  Isn't it intended to be an impediment?  Loser pays is

18  intended to be an impediment.  It's supposed to only -- it's

19  supposed to encourage people only to bring claims or to make

20  defense assertions or defenses that are really meritorious.

21          MR. JACKSON:  And I guess what I'm saying, you

22  know, we can have a meritorious claim.

23          If I sit down with a claim who has $100 claim

24  against LendingTree or $500 and there's a loser-pay

25  provision, and we think there's 80 percent chance we're

1  going to win, I would call that a meritorious claim.  But I

2  still would have to walk them through the financial aspects

3  of it that they may be on the hook if I would take it for my

4  fees and for the other side's fees.  Because as we know in

5  an arbitration setting or a courtroom, there are no sure

6  things.

7        Loser pays I think is much more viable when you

8  have two sophisticated parties that are looking down the

9  road at potential disputes and consciously deciding that

10 that's the way they want to approach it.

11       Let me just close with a couple of statements in

12 *Tillman*.  One is from the three-judge decision, and it says

13 "We conclude that taken together, the oppressive and

14 one-sided substantive provisions of the arbitration clause

15 at issue in the instant case, and the inequality of

16 bargaining power between the parties render the arbitration

17 clause unconscionable."

18       So it's not that we have to mirror *Tillman*.  As I

19 said, I think we have a stronger case.  It's that you look

20 at all of these issues and taken together, as they say, you

21 decide whether this is an unconscionable provision.

22       And then I would finally quote Justice Edmunds --

23 and I don't think there's a great deal of difference between

24 the three-judge opinion and Judge Edmunds.  I think Judge

25 Edmunds opinion is better.

THE COURT:  Judge Edmunds concurrence.

MR. JACKSON:  I think it's better because it says you look at the totality of the circumstances.  And the totality of circumstances shocked his conscience.  What he does is he says take all these circumstances together.

So I would just submit that:  One, you have the information I think -- one quick thing about pleading.

You know, its funny he says Mitchell has not pled specifically enough and on the other hand, Carson and Spinozzi are pled too specifically because they lift standards out of *Tillman*.

That's what they did.  They didn't left facts out.  They can't lift facts.  It's a different factual scenario.  But that court in *Tillman* said what does the Court need to know?  What does the Court need to look at?  It needs to look at these factors and that's what we put in.

So it doesn't violate the cases of rule that he says it does.  Because if we go with the evidence, we'll be able to prove each of those things that we pled.  I think it was as well pled as it could have been.

And I would just submit that I hope you'll deny the motion to dismiss, and, in any event, if you need more evidence, give us a chance to develop that.

MR. MELODIA:  Your Honor, I know you're -- begging your indulgence, two minutes at most.

1          The reason that there have been no --

2          THE COURT:  I'll give you two minutes also and

3     then we're stopping.  This is the last one.

4          MR. MELODIA:  The reason that there are no

5     individual actions and there might not be individual actions

6     arising from this situation -- and I have been trying to

7     avoid getting into the merits -- is because there's no harm.

8     There's no harm pled in the complaint.

9          THE COURT:  But those no -- I was about to say

10    causation to damages.  I mean, if you say you complied with

11    the Fair Credit Reporting Act, I'm not going to comment on

12    that one way or the other.

13         Let's assume you're right and you get the

14    negligence and breach of implied contract, what damages are

15    there?

16         MR. MELODIA:  There aren't, Your Honor, and I have

17    not I've won that case, Wachovia v. Geridono (ph) in the

18    district of New Jersey, which has been followed since.

19         THE COURT:  But admitting that, which I think

20    is -- I appreciate your admitting it, in one sense doesn't

21    that go back to what Mr. Murphy is saying, though, that

22    there's no economic chance for a plaintiff here standing

23    alone to prevail in district court meaningfully.  I mean you

24    win the battle and lose the war.

25         MR. MELODIA:  Your Honor, there are many, many,

1    many people who think they ought to be able to get a lawyer

2    to come into this courtroom and argue for them who

3    thankfully can't because they have no cause of action, they

4    have no damage, they have no claim.

5              THE COURT:  There's no damage.

6              MR. MELODIA:  Yeah.  If there's no damage and

7    there's no harm, there's no cognizable cause of action.

8    There's no standing.  There's no standing.  There's no

9    subject matter jurisdiction under Article III.

10             THE COURT:  Well, they might have a dollar's worth

11   of damages.

12             MR. MELODIA:  But they don't.

13             And so the reality is that, you know, if they have

14   a meritorious claim, there is fee shifting in place in

15   arbitration to assure that they will not only be able to,

16   you know, make their case, but they will actually, you know,

17   be able to shift fees to LendingTree for their meritorious

18   case.

19             The reason that a lawyer would have to think long

20   and hard about bringing that case where there was fee

21   shifting is for the reason Your Honor pointed out, which is

22   that it would deter claims that don't have merit and don't

23   have damages and are just fliers.  So that's point one.

24             Point two is options do matter.  Choices do matter

25   to the North Carolina courts.  The Little Red School Home

case, grammar, absolutely talks about choice. The fact that
the parents had a choice of private schools, you know, that
was absolutely determinative.

In a situation where the parents paid money for
tuition and got nothing, okay, they paid -- plaintiffs paid,
and got nothing. Not unconscionable. They don't pay and
get something. Unconscionable? If the standard is does it
shock the conscience if that's the standard, how in the
world could getting a free service and getting the service
and using it, and clicking and agreeing to terms of use
which are in bold, in all caps, which alert the reader from
paragraph 1 that arbitration is coming and that there are
limits on damages contained within this document. Do not
use this website if you disagree. How in the world could
that shock the conscience?

THE COURT: Thank you.

All right. Mr. Jackson, you get the last word.

MR. JACKSON: Thank you, Your Honor.

Just to clarify, the alleged applicability of the
Little Red School House case, *Tillman* says this about it.
"In Brenner, for example, the Court determined that a
contract between a parent and a private school was not
unconscionable. The Court so held after considering whether
there was any quality of bargaining power between the
parties where the plaintiff was forced to accept the

```
 1    defendant's terms and whether the contract itself was one
 2    that a reasonable person of sound judgment might accept."
 3              This is in Tillman.  Our case is almost on all
 4    fours with Tillman, and it's not like a parent having a
 5    contract with a private school.
 6              That's all I have.
 7              THE COURT:  Thank you very much, Mr. Jackson.
 8              All right.  It's 12:25.  We'll recess for ten
 9    minutes and we'll see if we can give you some guidance or
10    tell you we'll take it under advisement.  All right.  Thank
11    you very much.
12              (Court in recess.)
13              THE COURT:  All right.  Thank for your patience.
14    Once again I'm going to let you go to lunch.
15              This is a very, very intriguing case.  It arises
16    in the context of Tillman and it requires -- required a lot
17    of thought and deliberation by the Court.
18              But I think after hearing argument today I can
19    give you an oral ruling, and I think the oral ruling is -- I
20    believe this oral ruling will not only give guidance to the
21    Court, I believe this oral ruling is thorough enough and
22    detailed, and has had enough thought that it is as effective
23    as a written ruling would be without some of the niceties of
24    string citations and footnotes, but it should answer the
25    parties' question thoroughly and completely, so the Court
```

1    will now state its oral ruling.

2          After reviewing the pleadings, attachments and

3    case law submitted by both parties, and after hearing oral

4    argument the Court is prepared to issue its oral order on

5    defendant LendingTree's motion to dismiss and compel

6    arbitration.

7          As an initial matter, the Court rejects

8    plaintiff's argument that there's no agreement to arbitrate.

9    Plaintiff's state that they were unaware of the clause and

10   that there was, therefore, no meeting of the minds regarding

11   arbitration.

12         Plaintiffs have mischaracterized the basic nature

13   of contract formation. Both parties in this case indicated

14   assent to the terms of use of LendingTree by providing the

15   website and the terms and the plaintiffs by affirmly

16   checking the box stating that they agreed to those terms.

17         Neither party contests considerations, thus there

18   was an agreement and only the terms of that agreement are at

19   issue. Those terms are the terms of use, which plaintiff

20   has affirmatively accepted in their entirety. To quote

21   Judge Easterbrook, quote, "A contract need not be read to be

22   effective. People who accept take the risk that the unread

23   terms may in retrospect prove unwelcome." Close quote.

24   Citing *Hill v. Gateway 2000, Inc.*, 105 F.3d 1148.

25         Plaintiffs, through the objective manifestation of

1    their actions, agree to LendingTree's terms of use,

2    including the agreement to arbitrate.  The only issue now is

3    the enforceability of that provision.

4             The Court is guided in this matter by the Federal

5    Arbitration Act, and the, quote, "National policy favoring

6    arbitration, "close quote, it embodies, citing *Southland*

7    *Financial Services, Inc. v. Keating*, 465 US 10.

8             The North Carolina Supreme Court has recognized

9    this policy stating, quote, "Arbitration is favored in North

10   Carolina."  Close quote.  *Tillman v. Commerce Credit Loans,*

11   *Inc.*, 655 S.E.2d 369.

12            Under Section 2 of the Federal Arbitration Act a

13   written agreement to arbitrate is valid, irrevocable and

14   enforceable save upon such grounds as exist at law or in

15   equity for the revocation for any contract.

16            Plaintiffs contend that there are grounds for

17   revocation here; namely, that the agreement to arbitrate is

18   unconscionable under North Carolina law.

19            In North Carolina the party seeking to avoid

20   arbitration bears the burden of establishing he cannot

21   vindicate his rights under the arbitration agreement.

22   Citing *In Re: Cotton Yard Antitrust Litigation*, 505 F.3d.

23   283.

24            Thus plaintiffs bear the burden of establishing

25   that the agreement to arbitrate is unconscionable.  North

1   Carolina finds unconscionability as a contract on which,

2   quote, "the quality -- " excuse me, "the inequality of the

3   bargain is so manifest as to shock the judgment of a person

4   of common sense, and where the terms are so oppressive that

5   no reasonable person would make them on the one hand, and no

6   honest and fair person would accept them on the other."

7   Close quote. *Tillman* at 369.

8          The North Carolina Supreme Court has refined this

9   definition by explicitly adopting the framework of

10  procedural and substantive unconscionability.  The Court

11  provided three factors for procedural unconscionability:

12         One:  Unfair surprise.

13         Two:  Lack of meaningful choice, and

14         Three:  Inequality of bargaining power.

15         It then defined substantive unconscionability as

16  harsh, one-sided and oppressive contract terms.  But

17  procedural and substantive aspects of unconscionability are

18  required, though a high degree of one may compensate for the

19  other.

20         In *Tillman* the North Carolina Supreme Court

21  addresses these procedural and substantive factors and held

22  that the particular arbitration -- particular arbitration

23  clause at issue was unconscionable.

24         Regarding procedural unconscionability, the Court

25  noted the loan officer rushed plaintiffs through the loan

1    process, telling them where to sign, without mentioning the

2    arbitration clause, facts that support a finding of unfair

3    surprise.

4            The Court also noted that the bargaining power

5    between the corporate defendants and the consumer plaintiffs

6    was unquestionably unequal.

7            The Court does not -- the Supreme Court does not

8    seem to address lack of meaningful choice.

9            Regarding substantive unconscionability, the North

10   Carolina Supreme Court noted that the cost of arbitration

11   were prohibitively high for the plaintiffs.  To make this

12   determination, the North Carolina Supreme Court accepted

13   specific findings of facts made by the North Carolina

14   Superior Court regarding the plaintiff's earnings and the

15   cost of a AAA arbitrator in North Carolina.

16           The Court then discussed the clauses, the

17   loser-pay provisions.  Again accepting the trial court's

18   findings of the specific cost and fees any loser of

19   arbitration would bear.  The Court addressed the low damages

20   each individual plaintiff suffered, and the fact that such

21   low damages in light of the cost of arbitration made

22   securing legal representation unlikely for individual

23   claims.

24           The Court then described the one-sidedness of the

25   arbitration clause noting that no bar in over 68,000

transactions had ever brought an arbitration action against
the defendants, while exceptions in the clause allowed the
defendant to avoid arbitration and bring over 2,000
collection actions.

Finally, the North Carolina Supreme Court
discussed the clauses prohibition on joinder of claims and
class actions holding that such a prohibition was a factor,
although not dispositive, in determining substantive
unconscionability.

While there are similarities between *Tillman* and
the instant case, there are notable differences.

Bargaining power here was undoubtedly unequal as
the plaintiffs had no ability to negotiate the terms of use
with LendingTree.  There are, however, no facts indicating
unfair surprise.

Plaintiff has not alleged that it was rushed --
plaintiffs have not alleged that they were rushed in any way
or otherwise discouraged from reading the terms of use.  On
the contrary, plaintiffs were able to peruse LendingTree's
website at their leisure.

In addition, before the plaintiffs submitted their
information, they were inquired to check a box saying they
agreed with the site's terms of use.  The words immediately
preceding that box are the following:  "I acknowledge that I
have read and understood these documents, (please print

these documents for your records)."  Close quote.

That plaintiffs appear not to have followed this prompting to print and read the terms of use cannot be blamed on LendingTree.  It's a long-standing principle in North Carolina that, quote, "The law will not relieve one who can read and write from liability upon a contract upon the ground that he did not understand the purport of the writing or that he has made an improvident contract when he could inform himself and has not done so."  Close quote. *Leonard v Power Company*, 70 SE 1063; *Raper v. Oliver House, LLC*, 637 S.E.2d 555.

Thus, to the extent that plaintiffs were surprised by the agreement to arbitrate the surprise was not unfair, but rather was a result of their own failure to read the terms of use.  Even a cursory perusal of those terms would have revealed the fact that there was an arbitration clause as the very first paragraph reads in bold-face type, quote, "This agreement contains an agreement to arbitrate all claims and disclaimers of warrants and liability."  Close quote.

Finally, plaintiffs have not demonstrated a lack of meaningful choice.  As LendingTree has pointed out, it has a number of major competitors, any one of which were just as available to plaintiffs.

Accordingly, plaintiffs have demonstrated only one

1   of three factors and have fallen short of the showing made

2   by the plaintiffs in *Tillman*.

3         The differences concerning the substantive

4   unconscionability are even more pronounced.  Plaintiffs have

5   provided no evidence concerning their inability to afford

6   arbitration.

7         The United States Supreme Court has explicitly

8   placed the burden of proving prohibitive expense upon the

9   party seeking to invalidate the arbitration clause, citing

10  *Green Tree Financial Corp Alabama v. Randolph*, 531 U. S. 92.

11        Similarly, plaintiffs have not demonstrated that

12  their individual claims are too small for arbitration to be

13  feasible, where the plaintiffs in *Tillman* demonstrated that

14  their damages were approximately $4,500 each.

15        Plaintiffs also have failed to present evidence of

16  the one-sidedness that's so evident in *Tillman*.  There's no

17  evidence in the record that consumers would have been able

18  to arbitrate under the agreement, while the plaintiffs in

19  *Tillman* demonstrated that in over 68,000 loans, not a single

20  dispute had been arbitrated.

21        Furthermore, plaintiffs have not provided facts

22  that Lending Tree is getting round the arbitration agreement

23  as were present in *Tillman*.

24        Thus, the sole factors of substantive

25  unconscionability this case has in common with *Tillman* are

1   the loser-pays provision after the first day of arbitration,

2   along with the prohibition against joinder claims and class

3   actions.

4           The Court in *Tillman* held that all the facts

5   discussed, taken together, demonstrated substantive

6   unconscionability.  The loser-pays provision and the waiver

7   of joinder and class actions standing alone lacked the

8   cumulative effect present in *Tillman*, and are hardly so

9   oppressive that no reasonable person would make them on the

10  one hand, and no honest and fair person would accept them on

11  the other.

12          Accordingly, the Court holds the plaintiff has

13  failed as a matter of law to demonstrate unconscionability

14  sufficient to overcome the presumption of validity the Court

15  must afford to all agreements to arbitrate.

16          Having held that the arbitration agreement is

17  enforceable, the Court now holds that the present dispute is

18  within the scope of that contract which covers any claim or

19  controversy arising out of relating to the use of

20  LendingTree's website.  The arbitration clause therefore

21  must be enforced as to defendant LendingTree.

22          Plaintiffs may, of course, continue to pursue

23  litigation against defendants with whom they have not agreed

24  to arbitrate.

25          LendingTree has asked this case be dismissed for

failure to state a claim.  However, Section 3 of the Federal

Arbitration Act directs the Court to stay this action until

arbitration can be had according to the agreement.

It is therefore ordered that LendingTree's motion

to dismiss is denied, but that its motion to compel

arbitration is granted, and the Court directs the parties to

proceed to arbitration with all claims against LendingTree.

It is further ordered that this matter is stayed

as to LendingTree pending arbitration.  As to all other

defendants, this matter will proceed along the Court's

standard track.

The deadline for the other defendants' answers was

July 15th, 2008, and only defendants LendingTree and Home

Loan Consultants have answered, so plaintiffs may therefore

move for entry of default as to defendants Newport Lending

Corp, Southern California Marketing Corp, Chapman Capital,

Inc. and Sage Credit Company at this time.

Is there a case -- there can't be a case

management order for the other defendants since they haven't

answered.

So I think I've covered everything here.  Are

there any questions of the Court as to where we go from

here?

MR. JACKSON:  We don't have any questions, Your

Honor.

1          MR. MELODIA:  No, Your Honor.

2          THE COURT:  All right.  Then the Court's oral

3    order is as stated, and we will be in recess.

4          Thank you very much.

5          (Hearing concluded at 1:00 p.m.)

6

7                              - - - - -

8

     **UNITED STATES DISTRICT COURT**
9    **WESTERN DISTRICT OF NORTH CAROLINA**

10

11

12                   **CERTIFICATE OF REPORTER**

13          I, JOY KELLY, RPR, CRR, certify that the foregoing

14   is a correct transcript from the record of proceedings in

15   the above-entitled matter.

16

17

18

19   S/JOY KELLY

20   **JOY KELLY, RPR, CRR**                    **Date** _____
     **U.S. Official Court Reporter**
21   **Charlotte, North Carolina**

22

23

24

25